Case No. 25-7808 et al. Renat Akhmetshin appellant v. William Browder. Mr. Erdelak for the appellant, Mr. Nathan for the appellate. Good morning, counsel. I don't see you yet, but Mr. Erdelak, whenever you're ready, please proceed. Good morning, your honors, and may it please the court. Wesley Erdelak, on behalf of the Appellant Renat Akhmetshin. I'd like to reserve two minutes for rebuttal. It is undisputed that Bill Browder went on a nationally televised news program and claimed that Mr. Akhmetshin was, quote, a current spy operator in Washington. The question presented by this appeal is whether or not, having made this false claim in numerous media outlets, Mr. Browder should reasonably expect to be hailed into court in Washington to answer for the truth of those statements and the injury that they caused to my client. Whether this court applies the more flexible Fifth Amendment standard recently announced by the Supreme Court in Fuld v. PLO, or the more familiar Parenthood Amendment minimum contact standard, to answer that question under this court's precedence is yes. Under the Fifth Amendment, exercising personal jurisdiction over Mr. Browder is reasonable, given the substantial size of the district and the modest burdens that litigating in the district places on a well-resourced individual, such as Mr. Browder, who has visited the district countless times voluntarily. Can we start with the standard, what the standard is, before we dive into whether or not it applies here? So this is, the D.C. courts are set up pursuant to Congress's power over the district, which in one sense is broader than its other unenumerated powers. They basically have a police power over the district, which is why they're setting up local courts to do the general law of torts. But in another sense, it's more limited. The cases talk about power over the 10 square miles. They analogize Congress when acting pursuant to Article 1, Section 8, Clause 17, as if it were a state legislature for the district. So given all of that, why wouldn't we apply full-on minimum contacts, which is the test the Supreme Court has said governs for territorially bound states? Yes, Your Honor, I think the reason is that, as the Supreme Court said in fold, it really derives from the fact that there is a categorical difference between federal power and state power. And for that reason, when the federal, you know, it's a federal government that is acting when it makes laws for the district. And as the court said in fold, there really aren't any, or at least it didn't reach the question whether there are any inherent limits on the power of the federal government to exert extraterritorial power. Yeah, that's true as a general matter. And when Congress is enacting national legislation under the Commerce Clause or exercising foreign affairs powers. Did we lose Judge Pan? Sorry about that. No problem. Exercise of the fold is an exercise of the foreign affairs power. But this is, again, this is just Congress acting as a state legislature, managing local tort law. Just seems very different. Again, I understand certainly that the strength of the interests of Congress in making law for the district are certainly different. For example, the foreign affairs powers that were involved in the PSJA VTA in the fold case. So I would certainly acknowledge that the strength of the government interests are lesser in this case. And I think that would change the analysis. But I do believe still, you know, if the court did say one thing, it said that, you know, there's a categorical difference between Congress and the states. It matters in terms of determining what sort of constraints exist on the exercise of personal jurisdiction. I mean, I think there might be downstream a question of whether exerting jurisdiction to the full extent allowed by the Fifth Amendment comports with the necessary and proper clause. I think that's a more difficult question, but I don't think you need to reach that here because I think it is clear that there is a more relaxed standard that applies under the Fifth Amendment. And I haven't seen the, I don't believe Mr. Nathan contests that only the Fifth Amendment applies within the District of Columbia. So it seems to me that we have precedent directly on point that applies the sort of 14th Amendment minimum context test in the Fifth Amendment context here in the District of Columbia. We held that in an in-rate field case, and the DCCA has also analyzed this directly on point, saying that the minimum context type analysis applies under the Fifth Amendment, even though it originated under the 14th Amendment. And so it seems that when we look at FOLD, it would only be if FOLD eviscerated or overturned those direct precedents that we would take this path that you're suggesting. And FOLD is in such a different context. It's about a statutory grant of jurisdiction. So there's a difference between Federal Rule of Civil Procedure 4K1A, which is what we have been applying, those who are subject to the jurisdiction of a court or general jurisdiction in the state where the district is located, versus 4K1C, which says when authorized by federal statute. So we're looking at two different aspects of applying personal jurisdiction. And then, as you said, we're talking about, you know, a statutory grant in a foreign affairs area. So different. How is it that FOLD would eviscerate the on point precedent that says we should apply minimum context? Well, I think the reason that it would, that it would, I think, eviscerate those precedents is I believe that those precedents were decided under the assumption that the standards under the Fifth Amendment and the 14th Amendment were the same. And so I do think the development of a new Supreme Court precedent, which says that these standards are in fact materially different, does change that. And I certainly understand that it's under a different rule. Well, they held that they were the same in this context. They didn't assume that they're always the same. And the question is why a precedent in a different context would change the analysis under this context. Only for the reason that they have said that the Fifth Amendment, I don't think when these other cases were considered, there was a signal from the Supreme Court that the difference in the standards was materially different. But I should say, if the court doesn't want to reach the FOLD question, doesn't want to reach the question of whether or not the Fifth Amendment governs here, we are entirely comfortable saying that we think that the allegations in the complaint and the materials submitted to the district court give a very good case that minimum context do apply here. Among other things, the fact that in the statement itself that we're alleging is defamatory, so that Mr. Akhmetyan is a spy in the district. I think the other side says that, you know, the only real, as the court below found, I don't think the other side disputes if that claim is somehow intentionally directed towards the district, then jurisdiction is proper here. And if I get too far into that question, which I am also eager to discuss, at least one more question on the FOLD Fifth Amendment versus 14th Amendment question. Which of Congress's enumerated powers do you think it was exercising when it passed the long arm statute? Do you think it was exercising its Enclave Clause powers to make rules for the district? Yes, I think it's the Enclave powers to make rules for the district. Okay. And then we have precedent that says when Congress does that, it acts in the like manner of the legislature of a state. So how, why should we, how does that not kind of doom your argument that we need to, you know, apply a broader test than the test that applies to state courts? I think, again, the only reason I would say that it's different is that, as the Supreme Court explained in FOLD, there's a categorical difference between state and federal power. So even if the federal government is acting in a like manner as a state, it still has the inherent power to exercise jurisdiction actually territorially, which is greater than that, which is granted to the state legislatures. You would agree that FOLD didn't discuss territorial courts or, you know, D.C. local courts? No, Your Honor. And I'm happy for you to move into the argument you were heading towards, unless my colleagues have more questions on this. Again, the standard is whether or not Mr. Browder expressly targeted the district. The statement that our client has defined the district isn't enough to explicitly direct your conduct towards the district. It's very difficult to think of something that does qualify. But even beyond that, even if we, if the court were not to find that the statements themselves satisfied minimum context, this is a individual with substantial ties to the district. Many, many visits to the district for media appearances to promote his book, to lobby government. And I would specifically just want to draw attention to one specific incident, because I think it's highly probative here and related to the case, which is that in June of 2016, my client made, arranged for the screening of a documentary at the museum in Washington, D.C. Mr. Browder subsequently went to several D.C.-based media outlets. This is at pages 136 and 218 of the appendix and stated that that screening was done at the behest of Russian intelligence. So, again, numerous contexts generally oriented towards burnishing Mr. Browder's reputation as an expert on U.S.-Russian relations. Specific contacts with the district that are involved in fighting with my client and claiming that he is a Russian asset. Are you currently arguing the Calder effects test or the traditional personal jurisdiction test? I'm trying to understand which argument you're making right now. Well, I think there is a Calder effects test, which I think is, which we believe is satisfied here. And in addition, other contexts of the district, which I think are more in the species of personal availment, which would also support. But the defamation has to arise out of or relate to the context. How does that fit? I would say relates to the context in the sense that the prior context that we're pointing to are generally related to Mr. Browder cultivating a career and a reputation as an expert on U.S.-Russian relations, which is the capacity. But isn't the test that he has to reasonably anticipate being held into court for the defamatory statements? And these statements were made outside of the district about a meeting in New York. And so I don't, the defamation has to relate to the context. And I don't see how it does. Well, as they say, and I believe Justice Kagan said in the Fort Mortar Company, it's a rise out of or relate to. I think relate to is meant to encompass a more broad, non-causal relationship between the conflict. I believe the language is that there's some sort of affiliation between the form and the underlying controversy. And I believe that the underlying- What's your best argument that these particular statements arise out of or relate to the context in the district? I would say arise out of or relate to? Yes, because you've just talked about what the contexts are, but I haven't seen the connection yet between the statements and the context. Well, they're connected in the sense that it was in his capacity as an expert on U.S.-Russia relations that Mr. Browder made the statements. It was the reason why he was brought on national television to make the statements. And it's particularly the reason why the statements about- But being an expert is not connected to the district, is it? I mean, he's had some contacts with the district in connection with that, but I'm still not seeing the connection between the specific statements that you allege are defamatory and the contacts with the district. Well, I believe the connection or the way I would explain the connection is that through spending a lot of time in the district lobbying Congress, making media appearances, he created a status for himself as an expert on U.S.-Russia relations. And were it not for that status, he wouldn't have been someone who appeared on national television to make statements about my client. And he also- the statements would have had a degree of damage on my client's reputation, not for those- So is it your position then that any comments he makes as an expert on Russian relations, no matter where he makes them and about where, there would be personal jurisdiction in the district? I don't think I would go that far, but I believe that- I don't see how that's different from what you're saying in this particular case, because these statements were not made in the district. They weren't made about events in the district. So it just seems to me you're saying because he has contacts in the district related to his expertise, if he uses that expertise to make comments, there's personal jurisdiction in the district. Your Honor, I just want to say two things in response. I realize I'm getting close to the end of my time. First, I would say it is true that the comments were not made in the district, but the cases have never suggested that that question is dispositive. In Calder and also in itself, those statements were made outside the district. They were made from Florida about events that took place in California. And then second, I believe, Your Honor, and I don't mean to misquote you, that these are not about events that took place in the district. There was a meeting at Trump Tower in New York, was it not? Yes, Your Honor, but I want to make it clear, we are not claiming that these statements about the Trump Tower meeting are defamatory. My client admits he was at the Trump Tower meeting. We've never at any point suggested that those claims are false. What we claim is that the statement that he made those statements in his capacity as a Russian intelligence asset. And that claim that my client was a Russian intelligence asset is not something that was limited to one particular incident in New York. And in fact, on the face of the very… So if he said that in Great Britain, would there be personal jurisdiction here in D.C.? If he just said that generally in Great Britain? If he made the same child statements from Great Britain? Yes, Your Honor, because I believe they were explicitly… And if he made them in Russia, if he made them anywhere in the world, there would be personal jurisdiction in D.C.? Does him saying that your client is a Russian asset give D.C. courts personal jurisdiction over him, no matter where he says them? I believe that the place where they have said, I mean, it certainly would have some weight if they were made in the district. But I think the general fact that they're made from outside the district is not just positive, it's a factor. And again, the statement was not just that he was a Russian spy, but literally on the face of the statement, a Russian spy in the district. So that combined with his many other district contacts, I think, supports jurisdiction in this case. Can I ask, you rely primarily on Calder, which is a good case for you, but Walden later seemed to read Calder pretty narrowly. And I wonder what you do with that. Yes, Your Honor, I agree that it's certainly fair to read Walden as trying to pare back some of the more expansive implications of the Calder decision. But what he does say, and I think the most important thing that Justice Thomas says in the decision, is he says that defamation is different from other courts when thinking about these questions of personal jurisdiction. I believe what he says is the crux of culture is that the reputation-based effects of libel connect the defendant to the forum and not just the plaintiff. And I think that's certainly true here. If you look at the specific features of Calder that Justice Thomas indicated are relevant to the jurisdictional inquiry, I think he says that it's a statement about the district activities. Saying that my client is a spy in the district is a statement about the district activities of a district resident. It caused reputational damage in the district. It was made in media forums that are widely circulated in the district, and it caused injury in the district. So all of the elements that Justice Thomas identified as making jurisdiction proper in Calder, I think, are satisfied here. I think the only consideration that Justice Thomas identified in Walden as being relevant to the analysis that we don't have here is the sources that he relied upon. And so, I mean, and on that, I'd say two things. First is that in his own, before the district court, in his briefing, Mr. Browder said that the sources that he relied upon to make the statements were AP news articles and also letters sent to Chuck Grassley. Those news articles are pages 38 of the appendix, and those are D.C.-based news articles, and also Chuck Grassley is obviously located in the district. But I think to the extent that, you know, whether or not jurisdiction is present here, relied on factual questions that are not available to the defendant about the benefit of discovery, I think it would be appropriate to have jurisdictional discovery on that question of where, of the basis. You didn't ask for discovery in connection with this analysis. You had asked for jurisdictional discovery in relation to the long-arm statute analysis. So I don't think you can ask for that here, can you? That is true, Your Honor. We only requested jurisdictional discovery. I guess the only other point I would make is that if there is a jurisdictional discovery on the constitutional question that would help to, you know, eliminate whether or not there's jurisdiction here, I think it would be fair to grant. I think it's forfeited. I think it's waived. You didn't ask for it in the district court. We don't grant that in the first instance here. We're not in the business of granting discovery requests. We review the district court's decision. You didn't ask the district court. Mr. Erdolak, on the similarities and differences between our case and Calder, you mentioned that one distinction is the sources. And I know you said you didn't think that distinction was supposed to carry too much weight. I think another distinction is that the Inquirer's largest circulation was in California. And it's nothing to make us think that CBS's largest circulation is in D.C. I have another question after that, but do you want to respond on that kind of detail? Yeah, I mean, I don't think we – I agree we don't have facts suggesting that D.C. is the widest audience. I think, again, I think what Justice Thomas said in Walden is that it was a media forum that was widely circulated in the district. I believe there's allegations on that score in the complaint that they had something like 700,000 viewers in the district, but I can confirm that on rebuttal, Your Honor. I think along the lines of what Judge Katsas was saying, Calder's a good case for you. It's arguably been read narrowly since then. But even if we take Calder as we find it, it's a high watermark sort of for this theory that you're depending on. So I think you have to be pretty close to on all fours with it. Even if we were to spot you that the sources don't do a lot of work in distinguishing it, and even if we were to spot you that the largest circulation versus a merely large circulation distinction doesn't do a lot of work, I think you're left having to show that the conduct defamed here, allegedly, is similar to the conduct allegedly defamed there. In our case, you've got a six-minute interview that's primarily focused on a meeting in New York. It does mention your client and does say that your client is operating in D.C., but that is about as fleeting as a reference can be. And I went back and looked at the Shirley Jones article in Calder, and by my count, every or almost every paragraph of that article – and there's about 12 paragraphs – talks about California. In the first paragraph, it talks about insiders who are in California. In the second, it says Hollywood. The third, it talks about a new TV show, which I assume is in California. The third talks about inside sources who visited the set and crew members, presumably all in California. The fifth paragraph talks about the crew. The sixth paragraph talks about shooting the show. The seventh paragraph talks about Hollywood and talks about her home in California. The eighth paragraph talks about the set. The ninth paragraph talks about former staffers. The 10th paragraph talks about a former employee. The 11th paragraph talks about another former employee. The twelfth mentions Hollywood. The 13th mentions the casting couch in Hollywood. The 14th mentions the movie in Hollywood. The 15th mentions the casting couch. Again, the 16th mentions the TV program in Hollywood. The 17th mentions the Hollywood industry. The 18th mentions a former associate in Hollywood. The 19th mentions people who work in Hollywood. And the 20th mentions the movie industry in Hollywood. I mean, to have 20 paragraphs, each of them mentioning California or alluding to California, and then, you know, 20 out of 21 paragraphs just seems a lot different than, like, three seconds in a six minute interview that mentioned Washington once. Your Honor, of course, I wouldn't claim that the statements that were challenging here are as focused on the forum as, obviously, an article that is entirely about California. But, again, I want to emphasize, we're not basing our defamation claim on any of the other statements about the Trump Tower meeting. Really, the basis of the defamation claim is the claim that Mr. Akhmetian is a Russian spy, which is not a claim that is limited in time and space to one particular incident in New York. It's related to the general activities. And, again, we're focusing on the statement. I understand the focus on the statement and whether that by itself is sufficient to support jurisdiction under Walden and Calder. And I certainly welcome those questions, but I do want to, again, emphasize this is a defendant who has many, many contacts in Washington. Aside from the museum example I gave, he also submitted a fair complaint against my client in July of 2016, just months after making the museum. And I think it's fair to say that those specific contacts relate to the dispute. I take that argument, and it may or may not be a winning argument. I think when you said what happened here was not as focused on D.C. as the Jones article was focused on California, though, that makes it really hard to rely on Calder because Calder is a high watermark. So you've got to be at least as focused on D.C. as Calder was focused on California, or else that outlier case, I think, isn't going to be able to do the work that you need it to do. Your Honor, again, I think that the rule that has come out of Calder is whether the offending statements are focused on the district. I do think a statement on the face of it says your client is a spy in Washington, which is really the only thing we're alleging is defamatory here. Your theory is this is focused on the district because the statements go to just how your client does his work as a lobbyist, and he lobbies in the district. But, boy, in a world where tweets go across the globe just automatically, someone tweets a statement that another individual is a, you know, corrupt fill-in-the-blank lobbyist, lawyer, bad guy. Doctor, whatever, that person can sue in his own forum on the theory that the communication makes its way into the forum, hurts the defendant in a more focused way in the forum, and is sort of targeted, necessarily targeted at what the defendant is doing primarily in the forum. I mean, then we're back, you know, then we're back to Judge Pan's point about you could have made the statement in Moscow or London or Hawaii or wherever. Your Honor, I just would say two things. Again, I don't think the cases have ever suggested that the place from which the defendant made the statements plays a particularly large role in the jurisdictional analysis, to Judge Pan's point. No, no, no, but no content made from a remote place with no contact to the forum, other than that the statement is saying something derogatory about the professional activities of the defendant. I would say yes, Your Honor, and the reason is that, as Justice Thomas said in Walden v. Fiore, I think the way that Justice Thomas narrowed color in a way to be consistent with the way the court came out in Walden v. Fiore was, I think, large part driven by taking on a very distinctive analysis of defamation as a tort, saying that defamation as a tort is different from other torts because it has an element of publication. The publication within the forum being a necessary element of the claim ties the defendant to the forum in a way that is different from other types of intentional torts. So I do think that would be consistent with what Justice Thomas said in Walden v. Fiore. And what's your best case post-Walden that would support a theory like that? Post-Walden?  Give me a second, Your Honor. Okay, well, you can give it to me on rebuttal if you want, or we'll check your brief, but I am not aware of a lot of such cases. So, anyway. Thank you, Your Honor. Anything else? Do my colleagues have any other questions? I just have one quick question. Oh, go ahead. Could you have sued in New York? That's a good question. I think we might have sued in New York, I believe, given the conduct of Mr. Browder in D.C. It certainly made sense to sue in D.C., given the fact that that was also where my client suffered the injury, where the reputational damage occurred. Given the fact that the statements were made in connection or in relationship to an interview that was about the D.C. meeting, I think we could have sued in D.C. as well. If I may, I just wanted to follow up on your colloquy with Judge Passis, which I thought was very illuminating. Is it then your position that any plaintiff in a defamation case can sue in the jurisdiction where that plaintiff resides, because the plaintiff has been harmed in that jurisdiction, because that's where that plaintiff lives and works, and therefore the reputational harm, et cetera, is centered and targeted in that jurisdiction? I'm sorry, Your Honor. If I said that was enough, I apologize. It sounded that way to me. Sorry, I just wanted to clarify. Yeah, me too. Oh, I'm sorry, Your Honor. To clarify, I think in addition to that, you would need allegations that, in addition to reputational harm, that the, again, the media, the statements were made on media, forms of media that were widely circulated in the district. But in this case, they were media that were circulating everywhere, so there was nothing special about the district in terms of the media. It was just national media outlets. So I'm still struggling to understand what connects the district to this set of facts in a way that other jurisdictions would not be. Yes, Your Honor. So the main thing is your client's presence in the District of Columbia and the reputational harm here, and just trying to understand what, in addition, is necessary. Yes, Your Honor. Again, as I read Walden, I think that is the plaintiff's suffering injury and reputational harm in the district is the primary consideration. In addition, I would say, again, wide circulation in the district, and then also some feature of the statements that gives them a district focus, which we think is made here by the fact that they are claiming that my client is in Washington. So just the statement that you said that your client is in Washington is enough, because in terms of the media outlets, the district is no different from Oklahoma or New York or wherever that Twitter and CBS News reaches. So there's nothing special about the district in terms of the media outlet. So then all I hear is that the statement was that your client is a spy in Washington, but that's just a statement of his location, which is still the same question. It's his location. Is your client's location in D.C. enough to provide that hook for personal jurisdiction? It seems like that's your position. Again, I think the fact that on the face of the statement that explicitly says that my client is a spy in Washington is suffices to give the statements a Washington focus, which again is what Justice Thomas identified in Walden. But that's the key fact, too. That's the factor on which you hang your argument, just the fact that they said a spy in Washington, which is specifically where your client is. Again, if we're only looking at the statements, then yes, I think that is the feature that gives them a Washington focus. But again, we also think that there are other contexts of the district which support jurisdiction here. Thank you. Do my colleagues have any other questions? Okay, we'll give you rebuttal time and opposition time on the cross field. Thank you, Mr. Erdelak. Thank you, Your Honor. Mr. Nathan. Thank you, Your Honor. May it please the Court. My name is Aaron Nathan, and I represent the appellee and cross-appellant William Browder. The appellant's theory of personal jurisdiction in this case would subject Mr. Browder to jurisdiction any time he speaks about Mr. Appalachian from anywhere in the world, apparently or seemingly for all time, whether under Calder or whether under the more traditional minimum contacts or relatedness standard. It appears that Mr. Browder is simply stuck with Mr. Appalachian and the District of Columbia if he ever chooses to speak about him anywhere in the future. I think that that violates the fundamental principles enunciated in Ford that the relatedness requirement exists to give a defendant fair notice of when a particular activity, a particular activity, can subject the defendant to litigation in a particular forum. And that exists so that the defendant can take measures to structure his primary conduct to avoid or mitigate the consequences of jurisdiction, including, and Ford makes reference to this, by purchasing insurance, which may or may not apply in all cases, or even by severing ties with the forum to avoid jurisdiction here. Mr. Appalachian's theories just do not read those options open to Mr. Browder. Now, there's been some discussion of the sources for Mr. Browder's statements in relation to the plaintiff's Calder theory here. I think it's important to note that there actually is record evidence of what the, I shouldn't use the term evidence, but there is material in the record that shows what Mr. Browder's sources were. Mr. Browder's very first statement that is challenged in this case was a tweet in which he shared or retweeted an NBC News article about the plaintiff. The article was titled, Former Soviet Counterintelligence Officer at Meeting with Donald Trump Jr. and Russian Lawyer. In the body of that article, the article described Mr. Appalachian as a former Soviet counterintelligence officer who is suspected by some U.S. officials of having ongoing ties to Russian intelligence. Now, that was in the very first tweet that Mr. Browder sent relating to this controversy. Subsequent statements relied on that information. By the way, that's the Joint Appendix 38. Subsequent statements relied on both that information and the Associated Press article that my friend referred to before, in which Mr. Appalachian served as a primary on-the-record source about the details of the Trump Tower meeting and confirmed his own connection to a Russian military unit that he described in an on-the-record quote as, quote, loosely part of counterintelligence. Is this all about the merits, or are you still making – are you making an argument about specific jurisdiction? Well, my hook, certainly, for bringing that up was that my friend on the other side was trying to defend the absence of allegations about the sources for Mr. Browder's statements as still somehow justifying a Calder theory. I'm just making the point that, in fact, there is information in the record about what Mr. Browder's sources were. They were the news articles that he woke up and read in New York on the day that he made the first statement. Let's focus on the contacts to D.C. I mean, the theory of personal jurisdiction is – it's expansive, it's worrisome for reasons we explored with your friend. But the gist of the defamatory statements has nothing to do with the fact of a meeting at Trump Tower in New York and everything to do with the allegation that Akhmat Zinni is a Russian operative. And this is all in the context where the two antagonists are fighting over legislation that one of them has supported vigorously and the other is supporting a repeal. And that is all necessarily D.C.-focused conduct aimed at Congress. And so the statement, you know, this guy who's lobbying against me on the other side should not be credited because he's a Russian operative, seems pretty D.C.-focused in a way that a lot of other defamatory statements, you know, this guy's a crook or whatever, are not. Well, Your Honor, I'd like to be clear about what the record actually is in this case. The statements at issue were made in July 2017. The first Magnitsky Act was enacted in 2012. The follow-on statute was enacted in December 2016. The complaint alleges that, well, virtually all, all but one of the contacts that are alleged in the complaint have nothing to do with Mr. Akhmat Zinni. On their face, they don't mention him. They don't relate to him. They do relate to Mr. Browder's longstanding advocacy in the district relating to the Magnitsky Act. But the complaint also alleges that Mr. Akhmat Zinni joined that debate at some point in 2016 after virtually every one of the contacts on which jurisdiction is alleged here. So what we're dealing with is... Sorry, are the contests, are the contested statements, the tweets? I have two tweets, a Business Insider comment and a CBS comment. Are those after Mr. Akhmat Zinni has weighed in on the statute? They are after Mr. Akhmat Zinni alleges that he commenced a lobbying campaign relating to the statute. That's correct. They are also after virtually all of the contacts that Mr. Browder made in the district relating to the statute. And I hasten to emphasize the contacts that are alleged only relate to the statute. The only one that even mentions Mr. Akhmat Zinni is the hermitage letter to the DOJ fire unit. And the status of that contact, as we discussed in our briefs, is contested. It's our position that those contacts can't be attributed to Mr. Browder and that appellant actually weighs his opportunity to make a contrary argument in this appeal. But the point is only that Mr. Browder had completed most of, if not all of, the Magnitsky Act-related contacts by the time Mr. Akhmat Zinni even joined the debate over the Magnitsky Act. Put those aside for a second where you have a pretty good argument on lack of relatedness. I'm just focused on the statements, the four statements that are not just related to, they are the basis for the claim. And I'm just exploring with you. Just as to those statements, we take the complaint, take the allegations in the complaint, we assume them to be true. We charitably read the complaint within the bounds of reasonableness. And all I'm asking you to focus on is these statements are made in a context where the two parties are at odds over whether the statute should be repealed. I'm sure, Your Honor. And in that context, there maybe is a greater focus or concentration or directedness vis-a-vis the district. Well, I'll take the question first under relatedness. If you're interested in my views as concerns the Calder theory, I'm happy to address that as well. But I understand you to be asking. I'm more interested in Calder. Relatedness of the statements to the district, not the other stuff. In the sense of the statements being whatever it is that Calder would require them to be targeted at and so forth. Yeah, something like that. Yeah, so the problem with that theory is that three of the statements don't mention the district at all. One of them does, but it merely mentions the district. So even just right off the bat, mentioning is not the same thing as targeting. It's not the same thing as purposefully availing oneself of the privileges of conducting business in the district. Those are all, again, fairly far afield from traditional notions of due process and fair play and the considerations that are at play here. The reason they can't satisfy Calder is, I think, and has been discussed by the panel already, Calder represents the high watermark of a relatively unusual found of personal jurisdiction. It's not unusual for plaintiffs to be sued. Excuse me. A simpler way of saying it is probably that there are ways to sue defendants who make statements. In most cases, the traditional way is to sue them in their home jurisdiction or in somewhat less usual cases in the jurisdiction where they engage in the conduct in question. And then Calder often creates a third option that's even more exceptional. And usually that ends up founding jurisdiction in the plaintiff's home state. That's only permissible where the factors enunciated in Calder are met. Anything less than that would end up extending Calder in a way that I'm not sure that any cases subsequent to Calder have done. Another reason, actually, that this would be an exception. What's the most important distinction in your view? Assuming we're reading it narrowly and looking for colorable distinctions, what's your best one? Well, I hate to choose. The first one I noticed was the phone calls into California, and that's not present here. But that seems a little precious to me. What else do we have? Well, I don't want to run away from the point that future cases need to be on all fours with Calder in order to satisfy the test, and this one isn't. But accepting that you want a little bit more than that, Calder and Walden subsequent to Calder talked about story in Calder. The focal point of the story was the forum, not just the plan, right? So it's not just that, you know, the defendants did X, Y, Z. It's that the statements themselves had a focal point and, excuse me, a forum as a focal point. Now, many statements will not have any forum as their focal point. Some will have more than one. But here, to the extent that the statements had any focal point at all, it's the forum that the statements were about. To go lower on the list risks expanding Calder into a sort of more creative use of effects-based jurisdiction than I think the Calder court or the Walden court or this court in subsequent cases has ever really entertained. I would also just emphasize that Walden itself, although Walden's gloss on Calder is a little bit hard to read in some ways, Walden speaks of the connections that the defendant made with the defendants made with California and said that it was only in addition to that because the focal point of the story was also California, that jurisdiction was proper in that case. If the colleagues have no other questions, we'll let you move on to the cross appeal. Thank you, Your Honor. Our argument in the cross appeal is quite simple. No one is contesting that Voss and Toff correctly state the law as the Supreme Court recently clarified. Can I ask you a preliminary question, though? If we think there's no personal jurisdiction, we can't reach your anti-SLAPP Act issue, correct? So there's no personal jurisdiction, we can't get to the merits, and this is grounded in the merits, right? No, respectfully, Your Honor, we disagree with that position. We've explained why in our papers, but the language of the D.C. statute is that the claim has to be likely to succeed on the merits. Now, of course, that can mean many different things. It can mean things that can't be applied in federal court. I have a different – I mean, regardless of what the statute says, it just seems to me that if we find there's no personal jurisdiction, we don't go any further. Well, there's – if there's no personal jurisdiction, you can't go any further with respect to my client. But the plaintiff has, I think, indisputably submitted himself to the jurisdiction of D.C. courts for purposes of, you know, whatever, however you want to characterize it, a counterclaim or a motion to dismiss with a prevailing party, you know, fee-shifting provision attached to it. I don't think there's – well, I'm not aware of – I'm happy to address it again on rebuttal or submit a letter to the court if there's a more particular question, but I'm not aware of the other side making any argument that they're immune from the consequences of the anti-SLAPP law simply because of the – because of our argument that there's no personal jurisdiction under Mr. Browder. They have made the argument that the D.C. anti-SLAPP law only shifts fees where the dismissal is on the merits. We think that's wrong for a few reasons. One of them is that, of course, as everybody knows, personal jurisdiction is a prerequisite to the merits. So if a plaintiff can't assert personal jurisdiction successfully by definition, that plaintiff is also not likely to succeed on the merits in that litigation. There's another statutory feature of the anti-SLAPP Act that I think confirms this. One of them – one of its provisions says that dismissals under the statute shall be with prejudice. Now, that's probably preempted by Federal Rule 41, but as a matter of statutory interpretation, there would be no reason to say that if the dismissals under the anti-SLAPP Act could only be on the merits because D.C.'s equivalent, Parallel Rule 41, just like the Federal Rule 41, says that unless the court orders otherwise, dismissals operate as an adjudication on the merits. So that's a further reason why we think that the D.C. Anti-SLAPP Act applies here. I'm sorry. I'm just confused by this because I don't think we can get to the fee issue without addressing the question of whether there was a likelihood of success on the merits, right? It's not the whole point of the anti-SLAPP special motion that gives rise to the fee shifting? Yes, Your Honor. And if we can't address the merits because there's no personal jurisdiction, I just don't understand how we get there. Well, what you need to address is whether the plaintiff is likely to succeed on the merits. And if the plaintiff can't successfully assert personal jurisdiction, then the answer is no. I understand that. I'm just, yes, I'm just having trouble with the notion that there's no personal jurisdiction, but we're going to go on to assess whether there's a likelihood of success in the merits in the context of the fee shifting. To me, that is a disconnect because I thought if there's no personal jurisdiction, we're done. Like you can make alternative arguments to dismiss before the district court, but the preliminary one is personal jurisdiction. And if you win, we're done. And it seems to me that if you want to pursue anti-SLAPP, you could have consented to jurisdiction and litigated the anti-SLAPP special motion staff were tried to. But since you asserted the personal jurisdiction and if you win, it seems to me that you don't get to go to anti-SLAPP. You're not consenting to the personal jurisdiction for us to get to the merits or for the district court to get to the merits. That's correct, Your Honor, although where I think we part ways is that I don't think that the court would have to say anything about the merits of Mr. Achmed's allegations or apply the law of defamation to those allegations in order to grant our anti-SLAPP motion. How? How? Because it doesn't have to show likelihood of success in the merits. And all the court needs to do to say that there is no likelihood of success on the merits. Zero, in fact, has come to the conclusion that because there's no personal jurisdiction over the defendant, the court cannot even. That's really bootstrapping. That's saying if you get dismissal based on no personal jurisdiction, you get fees. It's just there's a big leak there, isn't there? Well, in general, that's not a that's not the relief for a lack of personal jurisdiction. You don't get fees. It's a big deal. None of this is the usual remedy or the usual relief. This is just what the D.C. Council enacted in the anti-SLAPP Act and it's attached consequences to the bringing of meritless litigation. I guess the issue is. You're saying that you should win on anti-SLAPP fees petition because there's no personal jurisdiction. But to even get to the anti-SLAPP fees issue, it seems that there needs to be personal jurisdiction. We're saying that granting our motion to dismiss on any grounds that are raised in this appeal entitles my client to fees because it entails that the other side could not have prevailed, was never likely to succeed. Does that mean that in any defamation case, that in any defamation case where there's a dismissal for lack of personal jurisdiction, you get fees? To the extent the other provisions of the anti-SLAPP Act are satisfied, yes. Then you've got to look at the other provisions of the anti-SLAPP Act, which we can't do if there's no personal jurisdiction, right? Well, otherwise, trying to attach fees to any dismissal for lack of personal jurisdiction in an anti-definition case. All that applying the which provisions of the anti-SLAPP Act apply in any given case is going to vary depending on the circumstances. That's one of the arguments we've made about why parts of it can apply even when other parts of it are preempted by a valid. But if we're looking at it, we have to have jurisdiction, right? All you have to do, well, I think our position here is simply that looking at what the anti-SLAPP statute says, applying its terms to the allegations in this case is entirely permissible in the context of evaluating the plaintiff's own violation of what the anti-SLAPP statute forbids, which is bringing a meritless SLAPP suit or a SLAPP suit that's not likely to succeed. No, I just don't understand how that works with the fact that there has to be personal jurisdiction for us to move to the next step. I'm not sure. Otherwise, it seems to me if you're just relying on the fact that if there's a dismissal for lack of personal jurisdiction, then it seems like you're just saying in any defamation case where there's a dismissal for lack of personal jurisdiction, there will be fee shifting. I'm not sure. I imagine that's how it works. I think you have to look at the merits to get to that stage, and I don't think we can look at the merits if there's no personal jurisdiction. Well, you have to look at the merits in the sense that you have to look at the allegations in the complaint and make a conclusion about whether they qualify for the treatment that the anti-SLAPP statute provides for SLAPP claims. So, yes, it needs to be a petition involving public participation and so forth. But I don't see how that's any different than a court, a district court reviewing a, for example, a Rule 11 motion attacking the frivolousness of a pleading in a context where it so happens that in addition to being frivolous on the merits, there was no personal jurisdiction over the defendant. I think a district court's fully empowered to review the allegations of the complaint and reach that conclusion, even if it's also reached the conclusion that the defendant wasn't subject to personal jurisdiction in the first place. It's just that the anti-SLAPP analysis, just like that one, the claims focus now. But in that situation, they don't have to look at the merits of the case. Well, I think they... I guess not to the same extent. Right. I think you stop a little short of deciding whether it states a claim for relief. I agree with that. But I don't think you have to get that far either because all we're saying is that failure to establish personal jurisdiction entails that there's no likelihood of success on the merits. You don't actually have to look at whether or not Mr. Affleck mentions allegations state a claim for relief, only whether, as alleged, they qualify as... I understand. But then we are in the position that every defamation case means there's fee shifting. Every defamation case that's dismissed for lack of personal jurisdiction, there would be fee shifting under anti-SLAPP. If filed in D.C. and if the D.C. anti-SLAPP, if it falls within the definition of a SLAPP lawsuit under D.C. laws, yes, that is our position, to be clear. And that's what the D.C. Council intended, to shift the risk of bringing litigation that ultimately has no likelihood or is not likely to succeed on the merits to the plaintiff and deter either meritless, frivolous lawsuits or lawsuits that should never have been brought on this jurisdiction. The first place, which I think is this litigation shows, can do just as much damage and involve just as much delay and wasteful litigation as lawsuits that spend eight years litigating the merits as opposed to personal jurisdiction as in this situation. I realize that American Studies and other enterprises being banned are relatively recent. And you think that they kind of unsettled where the circuit was before. But since a boss has any D.C. Circuit panel granted an anti-SLAPP motion? No, Your Honor. We are asking this panel to recognize something that this court has yet to recognize, which is that contrary to the assumptions about D.C. law that the above panel relied on, the D.C. anti-SLAPP statute actually operates in some ways that, yes, are incompatible with federal diversity litigation because the federal rules grant them, but in other ways that are not. And when the D.C. Anti-SLAPP Act can operate in a way that's not preempted by the federal rules, we think the Supreme Court precedent requires the federal courts to apply it and allow it to operate in those ways. So here we have a situation where nobody had to do anything that was foreign to the procedures of federal litigation in order to come to the conclusion that the complaint had to be dismissed. It turns out that in that situation, D.C. law attaches a fee-shifting remedy. That's the end of the story as far as we're concerned. And it doesn't make any difference that in another case, perhaps, there might have been arguments about whether a discovery stay applied. If this case had been brought in D.C. State Court, D.C. Superior Court, there would have been a state of discovery. There would have been expedited hearing on the motion. There might have been other procedural requirements, as I alluded to before. The dismissal would have had to have been with prejudice. None of those things could have happened in federal court. But the fact is that they didn't. And D.C. law still requires a fee-shifting remedy in that situation. It's our submission that to ignore that aspect of D.C. law as it currently operates would be tantamount to imposing a sort of statutory drafting requirement on state legislatures. I mean, it strikes me as you're talking that this may not comport with the policies behind the Anti-SLAPP Act. The Anti-SLAPP Act is intended to discourage sort of vexatious litigation, you know, filing defamation claims in order to harass another person. So what if it's a meritorious claim on the merits, but there's no personal jurisdiction because they filed in the wrong place? Yes, the consequence of that is fee-shifting. And the reason is that the Anti-SLAPP Act is meant to deter vexatious litigation. But I'm just saying it's not vexatious. What if it's completely meritorious, but they made a mistake and filed in the wrong jurisdiction? Well, a plaintiff who makes a mistake might be in a more sympathetic position, but plaintiffs can act vexatiously. Your position would affect the person who made a mistake and had a meritorious claim. Yes, because the Anti-SLAPP Act engages in general as well as specific deterrence. But the Anti-SLAPP Act doesn't specifically deal with this scenario, but you want to extend it to a scenario which might not promote the policies behind the Anti-SLAPP Act. I think that the Anti-SLAPP Act deals with this scenario explicitly by providing that a SLAPP claim has to be dismissed if it's not likely to succeed on the merits. Plenty of claims that are eventually meritorious do not appear likely at the pleading stage. And, you know, ordinarily in federal court, that's not a basis for dismissal. Even if a savvy judge thinks that a claim is not going to succeed, if the 12b6 standard is satisfied, the claims go forward. That's a reason that the likelihood of success standard as— All I'm saying is I think that the purpose behind the Anti-SLAPP Act and its focus on merits, likelihood of success in the merits, suggests that they might not have contemplated, you know, a meritorious claim—this is just my hypothetical—being brought. And there's a mistake, they filed in the wrong place, and there wasn't personal jurisdiction, and there should be fee shipping in that context. Because it's not the kind of vexatious litigation that the Anti-SLAPP Act is intended to address. It's in the wrong forum. Well, respectfully, Your Honor, I think it's a mistake to conclude or to infer that it's only actually vexatious litigation that ends up subject to the fee-shifting remedies of the Anti-SLAPP Act. I mean, there are almost— I understand. You're just asking for an extension of it. It's just not clear to me that the policy reasons behind it support the extension. No, I think in the core applications of the Anti-SLAPP Act, it will sometimes be the case that a plaintiff with a claim that would otherwise ultimately prove to be meritorious has their complaint dismissed under the Anti-SLAPP Act because it's not likely to succeed at the pleading stage. Can you give me an example of that? Can you just give me a concrete example of a situation where you're not likely to succeed, but then you ultimately prevail on the merits? Well, this is the whole reason why that likely-to-succeed standard can't apply in federal court. It's going to be like a factual scenario in which somebody is not likely to succeed at this stage, but then they ultimately do succeed at the end. Because those are supposed to be—those are supposed to run together. No, well, no, I would submit that they're not. I think that's why plausibility— Give me an example. Give me an example. Give me a factual scenario that's an example of something that seems not likely to succeed in the merits at this stage, but is ultimately meritorious. I apologize. My mind is blank on that. But I think it's the reality that the plausibility standard only looks to what a plaintiff is able to allege, and then merits adjudications look to what a plaintiff is able to prove after discovery. And it just seems—it seems plain to me that sometimes plaintiffs who don't have access to all the evidence at the pleading stage are just not in a strong position to allege the case. And yet, because the 12B6 standard is more forgiving, assumes their allegations to be true, draws inferences in their favor, are able to get past that stage, even though the likelihood of success— Well, I mean, just to take another tack at it, likelihood of success is at least analogous to the preliminary injunction stage. And it's frequently the case that a claim isn't likely to succeed on the merits at the pleading stage, even though it still survives a 12B6 motion. That strikes me as a straightforward occurrence under—or at least it's the way the rules are structured in federal court. It's also—I mean, just to return to the point about the purposes of the anti-slap statute, it may be a regrettable consequence, but it is the policy choice the D.C. Council made that in order to deter vexatious and frivolous litigation, it had to draw the circle a little bit wider and end up attaching fee-shifting remedies to some plaintiffs who, if things had gone otherwise, if they had, you know, access to a little bit more information at the time they filed their lawsuit, they might have prevailed but couldn't and didn't, and therefore, because they weren't able to show that they were likely to succeed on the merits at the pleading stage, they have to pay the fees. And the anti-slap statute's purpose is simply to shift the burden, the risk of that outcome to the plaintiff rather than the slap defendant. It's confined to an area of litigation where the D.C. Council, I think, had not just reasonable but powerful reasons to worry about defendants who have engaged in protected activity, whether under the First Amendment or just consistent with First Amendment values, and are instead sort of as punishment for that held into court and then forced to bear the burden not just of losing litigation but of litigation itself. And I think all of that points to a rule that includes dismissals for personal jurisdiction because the plaintiffs should have to bear the risk of making a mistake in that area as well. It's just an exception to the American rule in a very tightly circumscribed category of cases. It works like this in other countries, and there's nothing particularly anomalous about it. Judge Walker asked this question of my friend before, but I can't think of a reason why this litigation could not have been brought in New York as opposed to in D.C. There were other options available to this plaintiff. By the way, this plaintiff's merits claims are not meritorious, and while there may be sympathetic plaintiffs out there who will get caught up in this and we can worry about their cases when it arises, this just isn't one of those cases. I don't think the court should hesitate to read D.C. law the way the D.C. Court of Appeals reads it, apply Supreme Court precedent on the Erie Hanna Rules Enabling Act, Rule of Decision Act, and grant the fee-shifting remedy that we've requested. Mr. Nason, you're over. Judge Walker, do you have questions? No. Please, Judge Nason, if you were going to. No, I was going to cut off the advocate pending any of my colleague's questions. Go ahead. I do have one or two. Someone is entitled to anti-SLAPP money when they prevail on a motion brought under 16-5502, and you haven't prevailed on a motion brought under 16-5502. So why is it this is not just sort of like textualism 101? Is that just kind of too literal? Well, it's true the district court denied the motion. We're saying the district court should have granted it, and you need to reverse the denial of that motion. But it's also a little too literal, both as a matter of D.C. law and as a matter of the way the federal and D.C. rules are written. Under 16-5502 just doesn't necessarily mean including all the possible bases for dismissal under 16-5502. It, I think, is more fairly read to mean under any of the possible bases for dismissal, which include, as the American Studies Court has held, a dismissal for failure to state a claim under sort of ordinary plausibility pleading rules. So that's one textual answer. The other one, which we have in a footnote in our briefs, but which I want to emphasize here, is that the rule in federal court is that all release is sought by motion. That's Rule 7. There is no motion under any particular state statute in federal court under any circumstances, even in ones where it's just obvious that the state statute applies. You seek release in federal court by filing a motion under Rule 7. By the way, it's the same in D.C. Superior Court. You file a motion under Rule 7, at least in the strictest and most technical sense, and you ask for relief based on the application of some substantive law. Here, that's the provisions of 16.5504 that attach consequences to the dismissal of an anti-slap motion, where you have a failure to state a claim on which relief can be granted. Okay. Any other questions? Okay. Thank you, Mr. Nathan. We will give you some rebuttal time on the court. Thank you. Back to Mr. Erdelich. Thank you, Your Honor. I'd just like to make a few points. There was a colloquy with my friend discussing Mr. Browder's contacts with the district. The colloquy is mostly focused on how the instant suit relates to Browder's work in the district, lobbying for the Magnitsky Act. I, again, just want to make it clear that in addition to those specific contacts related to the Magnitsky Act, again, Mr. Browder gave interviews with D.C.-based media outlets concerning a screening of a documentary at the museum, which was formerly in D.C., that Mr. Achmetchen arranged, and a group that Mr. Achmetchen was involved with arranged to screen that documentary at the museum. In those specific media outlets, Mr. Browder claimed that the screening at the museum was done at the behest of Russian intelligence. In fact, in a FARA complaint that he submitted to Congress the following month, that specific museum screening was in fact mentioned in the FARA complaint as another instance in which Mr. Achmetchen had served on behalf of Russian intelligence. So those contacts, which, again, are just a prior chapter of the current controversy that we see now, where Mr. Browder has accused my client of being a Russian spy and done so in order to protect his reputation in relationship to Magnitsky, I think does relate to the current suit. The statements you just mentioned, though, are not the four that form the basis for this claim, correct? No, Your Honor. These are other district activities that support the exercise of jurisdiction related to that statement. So you have a greater degree of targeting, but a tougher case on relatedness. I think it's fair to say that they're related in the sense that there's an affiliation between these prior acts that Mr. Browder undertook in the district and the current controversy between the two claimants, including essentially an identity of the insinuations about my client. There are previous occasions in which Mr. Browder had said Achmetchen is a spy. He's a spy in Washington, D.C., and specifically enumerated instances that took place in the district where Mr. Achmetchen was acting as a spy and in news outlets that are located in D.C. Both of the news outlets and the two media outlets that get related to this are in D.C. One other point just on Calder, just to make it clear. So there were two defendants in Calder about the facts, and I want to make it clear that one of the defendants, Calder himself, was in fact not the reporter that created the article or reached out into California for sources in the article. Mr. Calder's only involvement in the article at all was that he edited the article and that he refused a request on behalf of Ms. And jurisdiction was found to be proper under those facts. And just finally, on the question about whether or not on the anti-SLAPP issue, as I understand, the other side has, I don't think, no longer maintained that the D.C. SLAPP Act Special Motion to Dismiss Procedure can apply in federal court. And just to make it clear, it can apply in federal court because as the Supreme Court just ruled in Boston, the D.C. Anti-SLAPP Act Special Motion to Dismiss Procedure answers the same question as the federal rule. So it can apply in federal court. He can't bring a motion under that provision in federal court. And as Judge Walker pointed out, Section 5504A says that you may receive fees if you prevail on an action under 5502. So I don't understand how they could possibly claim that they are entitled to fees based on a motion that cannot be brought in federal court. I'm not saying I agree with him, but Mr. Nathan's response was he says he should have prevailed on that motion. And I think I understand you to be saying at least part of the Anti-SLAPP Act is clearly preempted. So that means that all of the Anti-SLAPP Act is preempted. And I guess my first question is, does the Anti-SLAPP Act have a severability clause or an anti-severability clause? I don't think it does, but you can correct me if I'm wrong on that. I'm not. I'm not sure off the top of my head, Your Honor, and you can certainly ask my other side, but I think we don't. Yeah. Go ahead. No, go ahead. But again, you don't. It's not necessary to resolve this question to, you know, claim that the entire Anti-SLAPP Act is preempted. I think the only thing that you would need to find is that specifically the section of the Anti-SLAPP Act that does conflict with the federal rules, which is 50502 and that special motion to dismiss procedure that cannot apply in federal court. And because, again, you wouldn't need to find that the fee shifting provision is not applicable in federal court. All you would need to find is that the fee shifting position provision explicitly ties the availability of fees to success under another version of the D.C. Anti-SLAPP Act that I think undisputedly cannot apply. Do you have a position on how this Anti-SLAPP Act motion relates to the lack of personal jurisdiction motion? Like if we find there's no personal jurisdiction, can we even reach the Anti-SLAPP Act? I don't think you can, Your Honor, especially because saying that there's a lack of jurisdiction means there's a lack of power to adjudicate or adjudicate on the merits. And I think also I agree in general that it seems that the purpose of the Anti-SLAPP Act is to deter frivolous lawsuits, not meritorious lawsuits that are merely brought in the wrong. I mean, it seems like it's doubly frivolous if it's both not meritorious and filed in the wrong court. It seems like you're asking, you're saying that we should, the Act imagines rewarding people for filing in the wrong court by protecting them from the attorney's fees that they might otherwise have to pay if they had filed in the right court. Again, on the assumption that we are, you know, that we do find that the special motion dismissed does apply, and the question is like whether a non-merits dismissal qualifies, I don't think that a case that is meritorious in terms of the actual claims that it's making but is simply in the wrong place is doubly frivolous. You would agree that a plaintiff, you would agree a plaintiff is unlikely to succeed on the merits if they file in a court with no jurisdiction? I just don't think filing in a court in the wrong jurisdiction has any relation to the underlying merits of the case. In order to succeed on the merits, you have to find a court with jurisdiction. So if you haven't found a court with jurisdiction, you're unlikely to succeed on the merits. Well, I think the question is if there is any court that has jurisdiction, I mean, certainly it could be brought somewhere else. It's not unlikely to succeed on the merits. I just don't think the question of merits goes to jurisdiction at all. You're reading likelihood of success on the merits to mean doesn't, is not dismissible under Rule 12b-6. Well, again, I think that's, yes, I think like likelihood to succeed on the merits is similar to a Rule 12b-6 standard, but again. Possible reading, but it's not an obvious reading. Success on the merits could fail for merits reasons or lack of jurisdiction. It's possible, Your Honor. And again, that's, again, why our fundamental position is that 5502 cannot apply to federal court. Because, again, fees are only available for a successful motion under 5502, regardless of the sort of basis of the dismissal. Fees are not available. Is it the case that when the Supreme Court considers likelihood of success on the merits in the context of a stay motion, that even if the movement is guaranteed to win on the merits below, that at least some justices had said that that movement would not meet the standard for likelihood of success in the merits if the case is it's not cert-worthy? Oh, sorry. I hadn't thought of that. So the question is, like, if a case is likely to succeed but not cert-worthy, would it be proper to say that it's not likely to succeed on the merits? Would it be proper for the Supreme Court to say in the context of the stay motion that the movement has not demonstrated likelihood of success on the merits? Because it's not cert-worthy? I thought that's what Justice Barrett had written in Dozier v. Mills, and I thought that Justice Kavanaugh had written the same thing in Labrador v. Poe a year or two later. I'm not sure any of the justices have written in disagreement with that. That does seem right, Your Honor. And if that's right, then that would suggest that there are more things that can affect likelihood of success on the merits than who is correct about liability, I guess, who is correct about the things we would argue about in a 12b6 motion. That does seem right, Your Honor. I think the distinction I would, again, point to is that a lack of personal jurisdiction goes to the court's power to grant relief. I appreciate that. Do my colleagues have any other questions? Okay. Thank you. Thank you, Mr. Erdelak. Let's see. We're back to Mr. Nathan for rebuttal on the cross appeal. Thank you, Your Honor. I'd just like to make one quick point addressing some of the questions raised by Judge Walker about how the answer to the same question and the severability analysis interact here. There is no severability clause that we're not relying on a DC law severability clause here. The severability principles come from two places. They come from the Rules Enabling Act, which contains its own limitation on the preemptive scope of even a valid federal rule that it shouldn't enlarge, modify, et cetera, any substantive right. It also comes from the Supreme Court's precedents and this court's precedents on how you limit the scope of the question, so to speak, that's being answered. Of course, if you let the sort of answer the same question standard sweep as broadly as, you know, the literal language of that phrase says it could, well, sometimes the questions could be defined at the highest possible level of generality. It could be very, very broad and suddenly a whole swath of state law are preempted by federal rules that are actually quite narrowly targeted to particular situations. So this court actually has a case post-Shady Grove applying the answer to the same question standard to the interaction between a federal rule of evidence and a DC law, that's Burke versus Air Service, and at 685 Federal Reporter 3rd at 1108, you can see how the panel in that case applied the standard and held that because the two rules could operate alongside one another, the state rule was not preempted by the federal rule under the Shady Grove standard that the Supreme Court just reaffirmed in Bach versus Choi. So our submission is that that's exactly what this court needs to do here. Is that case in the briefs? Yes, it is. Sorry, give me the name again. It's Burke against, and I think it's Air Services, but the citation is 685 Federal Reporter 3rd, and the Penn site I was discussing is 1108. Give me a moment, I can give you the page in the brief at which it appears. Just want to make sure I can find it easily. It's in your... It's almost certainly in our response. I have it, Burke. Okay, thank you. Thank you, Your Honor. If the court has no further questions, thank you for your time. My colleagues? Okay, thank you to both counsels for the very helpful arguments. The case is submitted.
judges: Katsas; Walker; Pan